Irvin S. Cox et al., Appellees, v. Emil J. Eckstrom, Appellant.

Gen. No. 4,994.

1. CONTRACTS—*what violation of obligation to keep books of account.* Held, under the evidence of this case, that the provision of a royalty mining contract requiring the lessees to keep correct books of account, was not fulfilled.

2. CONTRACTS—*effect of absence of specification in notice of cancelation.* It is not material that a notice to cancel fails to specify the particular ground for cancelation, if such ground exists and there has been no waiver thereof.

3. FORCIBLE ENTRY AND DETAINER—*when entry without process lawful.* Under a contract permitting re-entry upon land in the event of default without process of law, a re-entry, pursuant to such a default, is proper and restoration of the premises entered upon cannot be obtained by action of forcible entry and detainer, no force being used in making the re-entry.

4. NOTICE—*effect of giving, upon right of re-entry.* The giving of a ten-days' notice to quit does not affect the right immediately to re-enter, pursuant to a contract provision authorizing re-entry without notice.

Forcible entry and detainer. Appeal from the Circuit Court of Henry county; the Hon. EMERY C. GRAVES, Judge, presiding. Heard in this court at the April term, 1908. Reversed. Opinion filed August 10, 1908.

Statement by the Court. On March 15, 1906, Hiram Wells, E. W. Wells and Eugene E. Stillfield entered into a written contract of partnership under the firm name of Wells & Company. On April 18, 1906,

Emil J. Eckstrom, as party of the first part, and said Wells & Company, as party of the second part, entered into a written contract whereby the party of the first part purported to lease, to the party of the second part, certain land in the northeast quarter and in the southeast quarter of a certain section in Henry county for mining purposes only, from that date to April 19, 1913, and the second party agreed to pay the first party at the mine on said premises, as rent for the same, ten and one-half cents per ton for all coal taken out of said mine, "run of mine," during the term of said lease, payments of royalty to be made on the first and fifteenth of each month. The second party agreed to mine sufficient coal each year to pay the first party at least $250 in royalty each year. The lease contained a contract, by the second party, to yield possession at the expiration of the term of the lease. It also contained the following provisions:

"It is further expressly agreed between the parties hereto, that if default shall be made in the payment of the royalty above reserved, or any part thereof, or any of the covenants or agreements herein contained to be kept by the party of the second part, it shall be lawful for the party of the first part or his legal representatives, into and upon said premises or any part thereof, either with or without process of law, to re-enter and re-possess the same at the election of the party of the first part.   *   *   *   In order to enforce a forfeiture for non-payment of rent it shall not be necessary to make a demand on the same day the royalty shall become due, but a failure to pay the same at the place aforesaid, or a demand and a refusal to pay on the same day, or at any time on any subsequent day, shall be sufficient; and after such default shall be made, the party of the second part and all persons in possession under them shall be deemed guilty of a forcible detainer of said premises under the statute.   *   *   *

If the parties of the second part fail, within a year from this date, to put in switch on south side of present mine, this lease is null and void, as far as the same

effects the southeast quarter (1/4), Sec. 21-17-1 East. * * * And it is further covenanted and agreed between the parties aforesaid, that the party of the second part shall keep correct books of account of all coal mined, and that the party of the first part shall have access thereto at any time he may desire."

It was provided that the contracts contained in the lease should extend to and bind the heirs, executors, administrators and assigns of the parties. The lessees entered and operated the mine. The term "run of mine" meant the coal just as it was taken out of the mine. Afterwards appellees were selling screened coal and left more slack in the mine than appellant thought they ought to, and by oral agreement the royalty was changed to twelve and one-half cents per ton of screened coal.

On July 25, 1906, Hiram Wells conveyed his interest in the firm of Wells & Company to Emil J. Eckstrom, the lessor, and on August 4, 1906, Eckstrom gave to John Allen a like bill of sale of said interest, which bill of sale also bound Allen to assume all obligations of said company for which Eckstrom was liable. On January 25, 1907, E. W. Wells gave to Irvin S. Cox a bill of sale of his interest in said mine. On June 6, 1907, Eckstrom served a written notice upon Hiram Wells, E. W. Wells, Stillfield, Allen and Cox, that in consequence of their default and failure to mine sufficient coal to pay $250 royalty during the first year, and for failure to keep books of account, as provided by said lease, he had elected to terminate said lease, and that they were notified to deliver possession of the premises within ten days of that date. Eckstrom was a farmer and lived upon and farmed the surface of his land. The mine ran directly into the side of a hill, and the passageway to the mouth of the mine was between plaintiff's house and barn. There was a gate at this passageway. When Cox arrived at the mine the next day after service of this notice, he found the gate securely fastened, and was forbidden by Eckstrom to

enter.   Shortly thereafter an action of forcible de-
tainer was begun before a justice of the peace in the
name of "I. S. Cox, John Allen, and E. C. Stillfield,
partners under the name of Cox & Allen" against
Eckstrom.   Before the justice Allen sought to have
the suit dismissed as to him, but his co-plaintiffs gave
him an indemnifying bond and his application was ig-
nored.   Eckstrom had a judgment before the justice.
On a trial of an appeal in the Circuit Court, at the
close of all the evidence, the court refused an instruc-
tion requested by appellant directing a verdict for him,
and gave an instruction requested by appellees direct-
ing a verdict for them, which was entered, and a motion
for a new trial by Eckstrom was denied and appellees
had a judgment for the restitution of the premises to
them.   From that judgment Eckstrom prosecutes this
appeal.

G. W. Wood and Fred H. Hand, for appellant.

Searle & Marshall, for appellees.

Mr. Justice Dibell delivered the opinion of the
court.

We pass by the questions whether the present appel-
lees are partners as they describe themselves in the
complaint filed before the justice; whether, if not part-
ners, they can still maintain this suit; and whether the
instrument called a lease in the foregoing statement is
indeed a lease within the meaning of our statutes, or is
merely a sale of coal.   The main questions in the case
are, first, have the terms of this lease been forfeited,
and if so, second, could appellant lawfully re-enter as
he did, or must he surrender possession to appellees
because he entered unlawfully.

The proof is clear that the royalties paid appellant
by appellees, for the coal taken out during the first
year of the lease, amounted to very much less than
$250.   One of the appellees testified that he was ready

to pay the balance at any time when appellant would notify him how much they owed him on the first year's royalties. It was not appellant who was required to keep correct books of account, but appellees, and it was their duty to know what they had paid and how much remained unpaid. But we construe this lease to mean more than that appellant was to receive at least $250 each year. Appellees agreed to mine sufficient coal each year so as to pay Eckstrom at least that sum in royalty each year. The mining of the coal constituted a development of the mine and would inure to his future benefit, and when they had failed to take out enough coal to make the royalties amount to $250 during the first year, they had broken the lease by failing to take out the quantity of coal and to develop the mine to the extent to which they had agreed. The contract required appellees to keep correct books of account of all coal mined, and gave appellant access thereto whenever he desired. It is evident this provision was intended for appellant's benefit, so that he might readily know whether they were mining the amount required by their lease, and also whether they were correctly putting down all the coal they mined. They kept books in which were scattered through many pages accounts with miners who worked for them from time to time. These accounts were kept in several different books, including one which appellees had lost. There was no place in these books where an account was kept of the amount of coal taken out. That could only be ascertained by a search through many different accounts. Sometimes these accounts were undated. In some instances the entries were made long after the coal was mined. This method of keeping the books furnished an opportunity for failure to put down coal that had been taken out and to account to appellant therefor. The proof tends to show that many of these entries were difficult to be understood. We are satisfied that appellees did not keep such account of the coal mined as was required of them by the terms of the lease.

Appellant made many complaints to them about the books. For several weeks before this notice of the termination of the lease was served by appellant he was confined to the house by a broken leg, and early during that confinement he told one of the appellees that as soon as he was able to get out he should terminate the lease. Appellees then hired an expert bookkeeper and he attempted to make up an account of the coal mined, from such data as he could get hold of. This bookkeeper had no personal knowledge of what had been done, and we are of opinion that the books he prepared did not cure the previous violation of the contract in that regard. Appellees did not put in the switch referred to in a part of the lease quoted in the foregoing statement. The lease, therefore, by its own terms, became null and void as to the southeast quarter of the section, and the judgment restoring said quarter section to appellees was unwarranted. We find nothing in the evidence to show that that provision had been waived by appellant. It is true that in the notice he served he did not specify the failure to build that switch as one of the grounds for terminating the lease. That however was unnecessary. As to the other defaults, it was at the election of appellant whether he would re-enter for the default of appellees. The provision as to the southeast quarter was self-executing, and did not require any election on his part. We therefore conclude that as to the southeast quarter the lease had ceased to have any validity at the close of the first year, and that for the other defaults above stated appellant had acquired a right to terminate the lease, and that he exercised that right by his notice of June 6, 1907.

The contract, as quoted in the foregoing statement, made it lawful for appellant, upon such default by appellees to re-enter and re-possess the premises either with or without process of law. Section 1 of the forcible entry and detainer act, as first adopted in 1872, reads as follows: "That no person shall make an

entry into lands or tenements except in cases where entry is allowed by law, and in such cases he shall not enter with force, but in a peaceable manner.'' It is contended by appellees that by virtue of said section of the statute it was unlawful for appellant to lock the gate and shut them out of the mine after he had given them notice of said default, and that they were therefore entitled to be restored to the possession, notwithstanding their defaults. It is contended by appellant that it was lawful for him to re-possess himself of the mine for the default of appellees, because the contract permitted him to do so. This raises the important question of law in the case.

In Ambrose v. Root, 11 Ill. 497, decided in 1850, when quite a similar section 1 of the forcible entry and detainer act of the Revised Statutes of 1845 was in force, and where there was a similar contract permitting the landlord to enter and take possession upon the default of the tenant, it was held that this was not an agreement to do an unlawful act, and that this agreement was made for the purpose of accomplishing a lawful object in a lawful manner, that is, to enable the owner by the consent of the tenant to take possession of his own premises, and that the landlord was not liable to the tenant in trespass for taking such possession, unless he used greater force than was necessary.

In Page v. De Puy, 40 Ill. 506, where the lease contained a similar contract, it was held that the owner of the lease could not be guilty of a trespass in going upon the premises and in removing the tenant and her property, using only such force as was necessary. It was held that the entry was justified because the tenant had authorized it to be made, and that the law does not prevent a person from giving such authority, and that a recovery could only be had for excesses, if excessive force was used.

Fabri v. Bryan, 80 Ill. 182, is very much in point. The lease there authorized the landlord to enter

into possession with or without process of law under circumstances which had occurred. It was held that while the statute relating to forcible entry and detainer took away the right to make entry by force, yet when the lease contained such a provision, the contract was lawful and did not contravene the forcible entry and detainer act, and that the tenant could not recover against the landlord in trespass for such an entry. The court there commented upon Reeder v. Purdy, 41 Ill. 279, relied upon by appellees here, and pointed out the broad distinction that it did not appear in that case that the person charged with the trespass had been authorized by the occupant of the premises to make such a forcible entry. The court said: "In the one class of cases, the occupant had expressly agreed that the landlord might make such an entry, thereby waiving the trespass, unless the license should be abused by the use of excessive force, whilst in the other no such authority had been given." This decision was rendered in 1875, after the present section 1 of the forcible entry and detainer act, relied upon by appellees, had become the law. The foregoing rule has been followed by the Appellate Courts in Mueller v. Kuhn, 46 Ill. App. 496; Schaefer v. Silverstein, 46 Ill. App. 608; Wetzel v. Meranger, 85 Ill. App. 457; Turn Verein Garfield v. Vocke, 131 Ill. App. 528, and other cases. The cases relied upon by appellees, namely, Baker v. Hays, 28 Ill. 387, Shoudy v. School Directors, 32 Ill. 290, Reeder v. Purdy, *supra,* Smith v. Hoag, 45 Ill. 250, Phelps v. Randolph, 147 Ill. 335, and Hammond v. Doty, 184 Ill. 246, did not any of them involve a contract by the party in possession that the owner might enter with or without process of law, upon the default of the party in possession, and they therefore are not applicable to this case, as clearly shown in the comments already mentioned, made in Fabri v. Bryan, *supra.* But it is said that the cases above relied upon by us were actions of trespass, and that the rule there

laid down should not apply to this action of forcible detainer. We fail to see any distinction. If this entry would be held lawful if appellees had sued appellant in trespass, it cannot be that it is unlawful because appellees have chosen to bring forcible detainer. We therefore hold that by virtue of the contract between these parties, the defaults of the appellees gave appellant lawful authority to take possession of this mine in a peaceable manner.

The foregoing statement shows that appellant received a bill of sale of the interest of Hiram Wells as lessee, which was in fact a quarter interest, and held the same from July 25 to August 4, ten days, when he conveyed that interest to Allen. It is argued that the several defaults hereinabove specified occurred during that year, and that appellant was therefore partly responsible for these defaults and can take no advantage thereof. The proof shows that no coal was being mined just at that time, so that there was no default in failing to keep proper books of account during those days. The lessees had the entire year in which to put in the switch in question and to take out the amount of coal required to produce $250 royalty, and it cannot be said that when less than four months of the term had passed there was then a default in these respects.

It will be observed that appellant did not take possession by force in the usual sense of that term. He did not forcibly put appellees or any of the men out of the mine. He merely closed a gate upon the surface of his farm through which they must necessarily go to enter the mine, and did this at a time when there was no one in the mine, and when apparently no work had been done in the mine for several days, and kept the gate closed. He did not put appellees out in the ordinary sense of those words, but refused to permit them to enter. In one Illinois case a distinction is drawn between actual force and implied force, and this seems to have been implied force. One of the appellees testified that on coming to this gate some days later a

man in the employ of appellant came out of appellant's house with a gun and cocked the gun and pointed it at him. Appellees then called that man as a witness and he admitted having the gun, but testified that he held it behind him and did not cock it nor point it at the appellee who had so testified. Appellees therefore had no preponderance of their own proof that this act was committed, and there was no proof that appellant had authorized it.

It is argued that as appellant gave appellees notice to quit within ten days he was not at liberty to take possession within that time. We think this position untenable. The contract permitted him to take possession with or without process of law. The notice was obviously given as the foundation of an action at law to recover possession. Afterwards he decided to proceed under the contract without process of law. He had the right to resort to both remedies at the same time. Fabri v. Bryan, *supra*. After appellant had taken possession, he accepted $3.40 from appellees in payment of back royalty at the agreed rate. Appellees owed him this on coal actually taken out, and did not cease to be liable therefor because appellant had taken lawful possession.

We are of opinion that the instruction requested by appellant at the close of the evidence directing a verdict for him should have been given. The judgment is therefore reversed.

*Reversed.*

Finding of facts to be incorporated in the judgment:

We find from the evidence that appellees did not mine sufficient coal during the first year of their term, under the lease in evidence, so as to pay appellant $250 royalty for that year; that they did not keep correct books of account of all coal mined; and that under the contract between the parties appellant had lawful right to terminate the lease and to re-enter and re-possess himself of the same without process of law, and that he

elected to so do, and that his said act of re-entering and re-possessing himself of said premises and holding the same was the detainer for which this suit was brought; and also that appellees did not, within one year from the date of the lease or afterwards, put in the switch on the south side of the mine, as required by the lease, and that by reason of said omission, said lease became null and void by its own terms, as to the southeast quarter of said section; and that under the proofs appellees are not entitled to be restored to the possession of said premises.